Before we start, I've spoken to my colleagues about this, so this is a message from the three of us and not just from me. We think that there has been too much sealed in this case insofar as the briefs on appeal are concerned. We understand why some things are sealed. So, for example, allegations concerning the abuse of the child, the child's mental health situation. We understand that completely. But with regards to other matters, like, for example, the district court's determination of what Guatemalan law meant and how that plays into the hate conventions provisions and all of that, the procedural history of the case, those sorts of issues, the evidentiary rulings that don't deal with sensitive information, that stuff in our view does not warrant sealing. So, we're not going to give you any homework over the holidays, but by the end of, let's say, the second week of January, I think, let's say the 14th, which is a Monday, each side is to file at the same time revised redacted briefs that redact only the materials or the information. Dealing with the child's alleged abuse and mental situation, mental health issues. So, if you have any issues or whatever, you can get together and ask us for clarification. But I think you know where we're headed. There's just some stuff there that the public should be able to read about and know about in figuring out what we've done ultimately with the case. All right. With that, we're ready to begin. This is case number 18-14122. By the way, let me just say one more thing. I'm sorry. And that is we've read the record in its unredacted form, or at least the relevant parts of it. This courtroom is not sealed today, so you can refer to certain matters in generalized ways so as not to create any problem for yourselves or for your clients or for the child, and we'll know what it is you're talking about. Whenever you're ready, Mr. York. Thank you, Your Honor. My name is Jeff York. I am new to this case. Just for your information, my colleagues in our Miami office handled the evidentiary hearing below and I've handled the appeal. We're here on an appeal of an order granting petition for return of child. I also wanted to thank the panel for expediting oral argument in this case. We have several grounds for appeal. The first and lead one is the one I'd like to spend the most of my time on today because it involves what we would submit is a misapplication of the law, which this court reviews de novo. The briefs below, the district court judgment, or order below rather, and both parties' briefs cite to the Hanley case, and we clearly acknowledge that it is the leading case in this circuit in a Hague case like this. And speaking to the particular, the rights or custody rights prong of the test, and the language in there says what it says. It's a flexible standard, but it keys on the word rights, and there have to be rights for there to be a petition granted. It's an element, and the language in the Hanley case is for general application, and you have to move to step two of the process, which is in every case different. In other words, Hanley's precedent, but in Hanley and the other cases that have been cited, except for one, we're talking about the application and analysis of other countries' laws. Thank you. Just a quick question because you sort of focus on the word rights, and I understand your argument. The word rights in Article V doesn't stand alone. Rights relating to the care of the … child. So in the ultimate sort of law firm partner move, I said to one of my law clerks, I seem to have it in my head that the Supreme Court wants construed the phrase related to, and they said basically everything relates to everything else. Lo and behold, that case does exist. It's an ERISA case, and the Supreme Court cites Black's Law Dictionary, and Black's Law Dictionary says that relating just means connected in some way. So I understand your distinction between rights and obligations or duties, but why aren't there rights here that are connected in some way to the care of the child, especially given that 253 under Guatemalan law says, you know, obligated to care for the child. That just seems pretty close to me, especially when connected by this phrase relating to. Well, there's two reasons I would answer Your Honor's question. The first one is the word right is not in Article 253. It's obligations of … Nor is it in 261 though, right? No, but it's the words in 261 that are overriding of anything we would submit is power of the mother. So without regard to … My client was not the petitioner, so she didn't have to establish any rights. But under 261, which is what the OVAL court determined, both the district court and this court, although it … albeit in a different situation, they were talking about 261, and that's the significance of the OVAL case because in OVAL … 261 is sufficient to create a right of custody. It doesn't suggest, does it, nor does the language of 261 that it is exclusive of other rights. I believe that it … Yes, I think it does. In OVAL, the lower court opinion, the court said, petitioner therefore had the absolute right under Guatemalan law to determine EL's place of residence, a right of which respondent was admittedly aware. I think the district court used the word absolute right, and then in the 11th Circuit opinion, it says Article 261 of the Civil Law Code notes that children shall be in the power of the mother where the mother is unwed unless both parents agree that the father should have custody. Consequently, the district court properly determined that under Guatemalan law, Reyes had custodial rights over EL sufficient to render Perez's removal of EL unlawful. But doesn't that just mean that we said in OVAL that 261 gave the mother a sufficient right to do what the father here is trying to do, namely prevent the wrongful retention or removal? I think what it says is she was the petitioner in that case. The mother was the petitioner in that case. But I think what 261 has to be read, even independent of OVAL, it has to be read as exclusive of any other rights because how could you read it any differently? It would undermine the power of the mother language. You could never have a situation, and it says shall, shall be in the power of the mother. So there's no other reading. But I understand where you're going and where you're coming from, I think. And if the convention didn't say anything to define the term rights of custody, I think your argument would be on pretty good footing because custody means something different than just care of a child. It means who has the lawful authority to have the child in his or her home. But there is, as Judge Newsom mentioned, a partial definition of rights of custody. It includes those relating to care of the child. And so when care comes into play, doesn't Article 253 become relevant? 253 becomes relevant, but if you read it, it imposes obligations. And it's the Leonard, it's the language of the, or the reasoning of the Leonard case that we both discussed in our briefs. And admittedly, it's on appeal. But in that case, the court went through in the country's laws in that case, I think it was Turkey, different provisions that did provide rights because they used the word rights. And it's focused on other provisions where they used the word obligations. And they said, yes, this qualifies under the Hague standard for rights, but these obligations do not. And that's the same reasoning that we're asserting here. But one step further, which is the courts are obligated, while there's a flexible standard, the courts are obligated to read all of the provisions of a country's laws that apply in harmony. If you can't do that, you can't grant the petition. And that's all we're saying is 261 and its power of mother language and 253 cannot coexist or be read together if you're going to recognize a right under 253 that could trump the power of the mother language. But so let me ask you this. I mean, I'm trying to figure out how this plays out in real life. So if 253 only imposes obligations, responsibilities, the penalty for violation of which is criminal responsibility, right? That's what 253 says. Yes, Your Honor. And simultaneously, you say that 261 gives the mother sort of an absolute trump. Then does that mean that the mother can so seize through her power the custody of the child that she can unilaterally put the father in criminal responsibility in violation of the criminal law for not caring for his child? I don't think it addresses that situation. And I don't think that that would be a situation where if the mother takes exclusive power of the child and the father could not exercise its obligation, I don't think that that would expose them to criminal liability. I think what it's saying is if you neglect your responsibility, then when you're able to exercise it, then you could be exposed to criminal penalties. I mean, 253 says the father…is obliged to care for and support his children and will be responsible according to the criminal laws if he abandons them morally and materially and fails to fulfill the duties inherent to his parental authority. So he's got obligations of care, education, discipline to the child that if he violates, he is responsible for criminally. And if the mother under 261 can put a wall up around the child and say, tough newgies, then isn't it possible? Now, I can see you might have a good jury argument that, well, she's preventing him from doing his duty under 253. But when we're talking about trying to read two statutory sections in harmony, that seems like we're kind of driving a wedge between them to me just in terms of common sense. But you can't. Our point is you can't read one without the other. If you read rights, the word rights into 253, you're ignoring the power of the mother language. You have to be. If the father has no custodial rights, why was his authorization needed for the child to obtain a passport? I don't know that that's a custodial. I don't know that that's a right that's spelled out anywhere. I think just as a unwed mother, just as the father, that was required. I don't think that imposes a right. And clearly, that doesn't speak to the interplay between 253 and 261, which is what the district court, that's how the district court got to the legal conclusion that she got to. There's one other thing I'd like to mention, which maybe goes into all this. And Hanley, I would call 261 a trump card. I would call it that. I'm calling it that. It says power of the mother. You can't read it any other way. If it's a Hobson's choice, it's got to be decided for the mother because it says power of the mother. That's exclusive. Should be. And it's in a situation where they're unwed. It's not the same if they're married. And that's Guatemalan law. That's what it provides. Now, there was also a trump card in the Hanley case, which, had it been played correctly, would have rendered the rights analysis moot in that case. And that was this. If you read further on in Hanley, Hanley was about guardianship rights under Irish law and use of clear rights language, rights to make decision-making power over the children. But all the father in that case had to do was timely object to the guardianship, and he didn't do it. He tried to argue that he had implicitly done it by taking the child away, but the court said no, it wasn't timely. But if he had, it would have been a simple exercise of I object to this guardianship, and he would have had the same kind of trump card that we're arguing is inherent in 261. Wasn't there testimony by Mr. Palencia's expert that when an unmarried mother and father are living together with the child, then 261 doesn't have the exclusivity that you ascribe to it here? There was testimony to that effect. There was also testimony from the expert of the appellant that that was not the case, and there was nothing to base that on. In other words, and the briefs have said this too, that is that Guatemala is a civil code state. There's no case or country, there's no case law to construe it. So there was no basis to have accepted that expert opinion, and also it's the courts in this analysis, the court can look to the four corners of the argument. There's no argument that these translations are not accurate, and the parties have said it's a civil code country, there's no case law to rely upon. Are there different rules? And it's de novo with this court as well, that analysis. No, I agree with you on that last point. It certainly is. I mean, rule 44-1 calls upon questions of foreign law to be decided as issues of the law. But are there any specific rules? Understanding that Guatemala is a civil law country where the code reigns supreme and that absent extraordinary circumstances not present here, judicial decisions don't bear on the interpretation of the code. Are there any specific rules of statutory construction that govern in Guatemala that we need to be aware of? Because I didn't see any that were alluded to by the parties either in the district court or on appeal. I'm not aware of any, Your Honor, in the record either. So in our view, it's a, you look at the two. The Garcia case as well, I'd like to just mention this, I see my time has run. Okay, you can go ahead and finish. Okay. The Garcia case was a Northern District of Georgia case, which was relied upon by the district court as well fairly heavily. In that case, that was Spanish law. And in that case, there was an agreement between the parties to share rights. There was also Spanish law provides unless explicitly waived by one party that there are, in all circumstances, I believe, joint rights. So that case, that's what I said at the top, is the Hanley case sets up the standard, but every case is different when you look to the country's laws. And here, you can't read 261 the way that the courts read it because it doesn't, it renders it meaningless. And that's not in keeping with the rest of the civil code. Your Honor, thank you very much. You've saved your time for rebuttal. Thank you. Mr. Cullen. May it please the court. Stephen Cullen, Kelly Powers and Leah Houser. Your Honor, I'm grateful that you have unfettered the docket and unfettered the record because we see this is a very important case for this court. It's important because twice before in this nation, twice before, there has been an attempt to restrict Article 5A. An attempt was made in the Abbott case where Justice Kennedy explained why a negative right comes under Article 5A. And an attempt was made in the First Circuit in a famous case called Whelan v. Lynn where Chief Judge Lynch also explained why this concept of patria potestas, which is a concept utterly unknown in our jurisdiction, comes within Article 5A. And I do want to first address, Judge Jordan, your question at the end. It is important that we understand that different countries, whether the United States or Guatemala, have utterly different systems that use different semantics and different concepts of jurisprudence. Guatemala is a civil jurisdiction. It does not have rules of statutory construction. What happens is no different than Scotland, also a civil law jurisdiction. The law develops after it's been published in a civil code. So what did the framers of this treaty back in the 1970s realise? They realised that this concept, this rights of custody concept, which they set forth in Article 5A, is an unadorned term. It's unadorned. It's a basic, plain concept. And we can put a whole tapestry of every law of the world on this. Why? Because the whole idea is to capture in the widest possible sense, as Perez Vera says in her explanatory report of the treaty, capture in the widest possible sense a single right. Just one. One, one, one. That's all we need. Because that gets us through the second prong of Article 3. So what, in your estimation, in 261, does power of the mother mean? What does power of the mother mean? Unilateral rights with respect to all control of the child forever. So it's sort of like the ultimate custodial right, but not, you say, exclusive of sub-rights existing elsewhere. I'm smiling because you've hit the nail on the head, we see. Exactly your use of that word custody is different from the way Guatemala understands that term, the way Ireland understands that term in Hanley. Because custody is just one notion of a right, an obligation, a negative right over a child that comes within the treaty. Because the idea, Judge Newsom, was not to find ways to restrict the remedy, to find a way to bring every possible case into this amazing treaty. When it was drafted, as you know, the belief was maybe two or three countries in the world would sign on to it. We have a hundred nations now. And of those hundred nations, most of them, Judge Newsom, don't ever use the word custody in their laws. Doesn't appear. And so 5A takes us to, well, what do we mean in the treaty by rights of custody? Which, interestingly, is put in the treaty in single inverted commas. And it's done so, and that's done so because this is a text-based treaty. As Justice Kennedy explained in Abbott, this is text-based. We look to what this treaty is trying to say in the plain words. And up and down the land, we have judges saying, I can find a single concept here that captures the second prong of Article 3, that gets us to rights of custody. Because, as you said in Hanley, you have to be very careful of imposing American concepts of custody and American concepts of the semantics of custody on other nations. For example, before this court was divided between the 5th and 11th Circuit, it just comes to mind now because I was reading the amazing story outside about Judge Kravitz just before we started. The 5th Circuit in Texas, for example, the word custody doesn't exist. It talks about conservatorship. And if you look at other countries dealing with Texas cases and returning children to Texas, they have the same issue with what does that mean? Is there something in the word conservatorship that brings in the right to care for the child? The other point, Judge Newsome, you mentioned relating to. Again, we say that's very important because the plain language of that in Black's Law Dictionary is anything that relates to the care of the child. So, I was anticipating some challenge on, and I'm sure you've had it in your minds, about obligations versus rights. But we say that the concept of obligation is even stronger than the concept of right, and so must be included. One would be tempted to say it's a tautology. One would be tempted to say rights and obligations mean the same thing, and then an obligation is clearly a right, and we get into that circle. But if we think about it, if the father here had the obligation to care for the child, support the child, educate the child, discipline the child, what does all that mean? It means he was duty-bound to forge this child's, and I don't want to overstate it, but forge this child's destiny in his life. He was duty-bound to influence the child's language, culture, traditions, country. How can that not be a right that is being violated by the unilateral removal, and when the whole idea behind the treaty is to stop unilateral removals that impinge on a parent's obligations to care for their child? So I guess I worry that I'm wading into philosophical waters here, that I'm not sort of equipped to swim in, but is your position then that a must necessarily implies a may? If the father must provide care, education, discipline, then of necessity, sort of philosophically in the ether, he may do those things? Yes, because there are different types of parents. There are good and bad. There are involved parents and uninvolved parents. There are parents who do less than criminal actions, but certainly do a very poor job in advancing the child's life. And so, yes, that is our position. Because otherwise, again, we get into this very concerning area of limiting the scope of this treaty. Because every one of these cases is different, but every one hinges on can we find one right, just one? And so when my learned friend said, for example, that essentially if you advance article 253, then you are eviscerating article 261, I can see why that would be an argument in the concept perhaps of internal law in a country. But it's not relevant in the context of a Hague case, because all the treaty is asking you to do is find one right. And that right can be, as was explained in Abbott, something entirely negative. As you know, in Abbott, it was Chile. It was a statutory restriction on removing a child. And the argument went that, no, you can't possibly say that something negative is a right. And Justice Kennedy explained, no, that would turn the treaty on its head, because the whole idea is a uniform approach that ensures consistency and that captures the widest possible result. So although, of course, Abbott, it was 6-3, like your typical Scotland soccer game against England, we typically lose about 6-3. But Abbott forged the whole confirmation of what really Chief Judge Lynch had said years earlier in the Whelan case. Look for anything, even if we don't understand this concept in our jurisprudence. And article 253 clearly enunciates obligations on this father to bring this child up. So your argument, as I understood it in the briefs at the end of the day, is that even if article 261 trumps article 253 in a case of a conflict between the mother and the father, for example, with regards to education, that doesn't mean that article 253 doesn't create rights of custody. It just may mean that under Guatemalan law, one right is superior to the other where there's a clash. Yes, that's exactly right. And the reason for that is, if you look at many civil law jurisdictions, they have patria potestas, they have custodia, they have this other concept called guarda, but they all apply in the context of a Hague case, even though they may have priority in the internal jurisdiction of that particular country. So it really is this circuit that, in Hanley, took the impetus to say we have to look in the broadest possible sense. I think many, many Hague practitioners were very worried that these guardianship rights in Ireland would be considered something lesser than an article 5A right to care. But you said the opposite, and our concern coming in here today is that any attempt to restrict, because that's what we're talking about, restricting the very wide scope of this treaty will ultimately undermine the treaty. And why does that matter to us here? Why does it matter to get a child back to Guatemala? Well, it matters because we want our children back from other countries. And the way this treaty is to be addressed is internationalism. It may not be the flavour of the month, but this treaty is based on an international approach to the protection of children and to prevent unilateral action by one parent. And, Judge Branch, I thought your question about the passports was very important, because it is clear that the mother still needed the involvement of the father to get the Guatemalan passport. How can that not be, in and of itself, a right to care for the child? Because you don't want children crossing international borders without passports. We don't want the child going back to Guatemala without being admitted, without any difficulty into the country. Was there any testimony at the hearing? I haven't read all of the testimony at the hearing about whether or not, in a jurisdiction like Guatemala, the mother would have needed the father's express consent, written or otherwise, to remove the child from the country? Right. And our expert attorney, Leiva, says that she would have needed that right. That when you look at the Guatemalan constitution, this is in her rebuttal affidavit, and when you look at various other articles in the immigration code, that she couldn't do a unilateral removal. But, of course, we're talking here about a wrongful retention, a wrongful retention, because the facts of this case is— for a significant or indefinite period of time from the country, that might go to the question of whether or not article 253 provided him with some rights of custody. Yes, Your Honour. In our appellee's appendix at tab D, we added bait stamping to it, so it would be page ADD63, which is page 9, I believe, of our rebuttal affidavit. Attorney Leiva explains exactly that point to Judge Jordan. So, of course, what the lower court did here is exactly what it was supposed to do, and it notes in a footnote, I have found one right. I don't need to look at anything else. Article 253 is enough. That gets me habitual residence. It gets me a right under article 5A, and we have to be very careful to say it doesn't give me evidence of a custodial right, because now we're getting back into the semantics problem. The lower court said, it gives me an article 5A right. Clearly, there was exercising of that right, and for all those reasons, we say, please affirm. This is a great opportunity for the court to continue to emphasise that this treaty should be advanced in the widest possible sense. Thank you, Your Honours. Thank you very much, Mr. Cullin. Whenever you're ready, Mr. York. I don't think the Abbott case or the Whelan case, or frankly, any of the cases that have been cited to the court, involve a situation like what we're dealing with here, which is, how do you read, and I'm going to go back to it, how do you read article 261 in this case where the children will be under the power of the mother, whether they're not legally married or under a non-marital union, of which there's no question in this case that it applies? Why isn't the answer to your why or how question, how do you read these two things in harmony, Judge Jordan's answer, which is somebody's got to be, as George W. Bush said, somebody's got to be the decider. So he's the decider, but that doesn't mean that Cheney and Rumsfeld and the rest of the crew don't have a say. Father's got a say, and Mr. Cullin says a say in these things like care and education and discipline under 253 via article 5, good enough. Because in a case like this, it completely reads out that ultimate power, and I agree with Mr. Cullin, the way that he defined article 261 is, I wrote most of it down, a unilateral absolute right to decide the child forever. So that, and what I'm saying is that has to be exclusive of all other rights. And then you go back to where the court found, there wasn't any testimony, by the way, Judge Jordan, I believe Mr. Cullin was reading from an affidavit. I don't recall that that particular provision that he read was testified to. No, and that's what I understood him to say, that to the extent that any such evidence is in the record, it's in the affidavit and not in live testimony at the hearing. But I don't think a ministerial part of the immigration code that provides a passport requirement on both the mother and the father plays into this. And it certainly doesn't play into article 253. And I go back to the plain language of article 253, that is, obligations of both parents. All this stuff about negative rights, the word rights, not in there. It is in all the other cases. And finally, power of the mother, the plain language of that has to be respected. And simply put, granting the petition eviscerates it. All right. Thank you very much. Before we finish, I just want to recognize that, as all of you know, these are very difficult cases, both legally, emotionally, practically, and have to be decided on a very, very short fuse. And we want to thank all of you for your representation of the parents in this case. I know your clients certainly appreciate it, and we do as well. We're in recess.